1

2

3

4

5

6

7

8               UNITED STATES  DISTRICT COURT

9                  Northern District of California

10                      San Francisco Division

11   NADA PACIFIC CORP.,                         No. C 13-04325 LB

12                     Plaintiff,                **ORDER GRANTING BESSER'S**
                                                 **MOTION FOR SUMMARY**
          v.                                     **JUDGMENT**
13
     POWER ENG'G AND MFG., LTD., et al.,         [Re: ECF No. 71]
14
                      Defendants.
15
     AND RELATED COUNTER- AND CROSS-
16   CLAIMS

17   _____/

18                          **INTRODUCTION**

19       In this action, several entities sued each other after a microtunnel boring machine broke down

20   while it was boring an underground tunnel on a construction project for the San Francisco Public

21   Utilities Commission ("SFPUC").  Plaintiff Nada Pacific Corporation ("Nada") leased and operated

22   the machine as a subcontractor for the project's general contractor, and Defendant/counter-defendant

23   Besser Company ("Besser") manufactured a component in the machine.  Besser moves for summary

24   judgment against Nada on three grounds: (1) Nada is judicially estopped from arguing that Besser's

25   allegedly defective component caused the boring machine to fail because Nada argued before a

26   dispute resolution board established by its general contractor's contract with the SFPUC that site

27   conditions caused the machine to fail; (2) alternatively, Nada cannot use the collateral source rule to

28   obtain a duplicate recovery of the amounts it recovered from its general contractor for the same

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   damages it seeks in this case; and (3) alternatively, Nada has put forth evidence of only its economic

2   losses and thus the economic loss rule bars its tort claims.  Upon consideration of the parties' papers

3   and their arguments at the November 6, 2014 hearing, the court holds that (1) judicial estoppel does

4   not apply because the dispute resolution board did not decide the dispute, (2) Nada's potential

5   recovery is offset by the money it recovered from its general contractor, and the collateral source

6   rule does not apply, and (3) the economic loss rule bars Nada's tort claims against Besser.  The court

7   thus **GRANTS** Besser's motion.

8                                                   **STATEMENT**

9   **I.  THE PARTIES AND THE PROJECT**

10      This case arises out of the September 2010 failure of a microtunnel boring machine ("MTBM")

11  while it was boring an underground tunnel on a construction project referred to as the San Francisco

12  Public Utilities Commission-Alameda Siphon Project No. 4, in Alameda County, California (the

13  "Project").  Joint Statement of Undisputed Facts ("JSUF"), ECF No. 71-2 at 2.[1]  The owner of the

14  Project was the SFPUC, and the general contractor on the Project was Steven P. Rados, Inc.

15  ("Rados").  *Id.*  Nada, a licensed general engineering contractor specializing in microtunnelling

16  construction projects, acted as a microtunneling subcontractor to Rados on the Project.  *Id.*

17      To perform its work as a tunneling subcontractor on the Project, Nada leased an MTBM from

18  third-party defendant, Akkerman, Inc. ("Akkerman").  *Id.*  Because the leased MTBM had a 74"

19  diameter and the Project required a 96" diameter, Nada separately leased an "increase kit" from

20  non-party Walter C. Smith Co., Inc. to enlarge the diameter of the face of the MTBM to the required

21  project dimensions.  *Id.* at 2-3.  Nada also installed on the leased MTBM a "cutter head" that Nada

22  owned.  *Id.* at 3.  The cutter head is the front-most piece of an MTBM, which rotates to bore through

23  the ground.  *Id.*

24      The leased MTBM contained a planetary gearbox designed and manufactured by defendant and

25  cross-claimant Power Engineering and Manufacturing, Ltd. ("PEM").  *Id.* The PEM gearbox

26  contained a cast iron planetary carrier manufactured by Besser, which Besser sold to PEM for

27  _____

28          [1] Citations are to the Electronic Case File with pin cites to the electronically generated page
    numbers at the top of the page.

UNITED STATES DISTRICT COURT
For the Northern District of California

$952.00, plus a $25 pallet and box charge, in September 2008.  *Id.*

## II. THE MTBM'S IMMOBILAZATION, RESCUE, AND INVESTIGATION

In September of 2010, while Nada was operating the MTBM to bore a tunnel on the Project, the MTBM became immobilized underground.  *Id.*  The immobilization occurred roughly 254 feet into tunnel bore, and 12 lengths of 20-foot interconnected steel casing pipe had been installed behind the MTBM when it became immobilized.  *Id.*  With Nada unable to advance the MTBM forward or move it backwards because of the pipe sections that had been installed behind the MTBM, a rescue shaft (or "911 shaft") was constructed above the MTBM to expose it and then raise it out of the ground with a crane.  *Id.* at 3-4.

After the MTBM was removed from the ground, it was sent to Nada's facility in Caruthers, California for examination and repair.  *Id.* at 4.  Upon examination, Nada discovered that the gearbox within the MTBM was cracked.  *Id.*  Nada subsequently obtained a replacement gearbox, performed other repairs to the MTBM, returned the MTBM to the site, lowered it into the tunnel bore alignment, restored the earthen cover removed to create the 911 shaft, and re-launched the MTBM on the Project, which Nada was then able to complete.  *Id.*

The failed gearbox was sent to PEM's facility where a non-destructive inspection was performed on or about November 16, 2010.  *Id.*  The Besser-manufactured planetary carrier within the gearbox then was sent to the University of Northern Iowa ("UNI") in Cedar Falls, Iowa, where it underwent destructive testing on or about February 28, 2011 at PEM's request.  *Id.*  Based on that destructive testing, UNI prepared a report dated March 31, 2011.  *Id.*  Structural Integrity Associates, Inc. then prepared a report dated April 12, 2011, which analyzed the UNI report.  *Id.*  Both reports were available to Nada prior to the Dispute Review Board proceeding discussed below.  *Id.*

## III.  NADA'S REQUEST FOR CHANGE ORDER

In connection with the costs Nada incurred to rescue and repair the immobilized MTBM, Nada submitted a Request for Change Order to Rados on September 6, 2011 and Rados passed that Request for Change on to the SFPUC.  *Id.*  Nada's Request for Change sought compensation for additional costs as follows:

| Item | Date of Work | Description of Work | Extended Costs |
|------|--------------|---------------------|----------------|
| A | Sept 21, 2010 to Sept 24, 2010 | Additional Costs related to Initial Lockup of Mtbm Cutter Bit and efforts to free Mtbm | $  144,061.23 |
| B | Sept 27, 2010 to Oct 7, 2010 | Additional Costs incurred during installaiton of Recovery Shaft | $  266,847.06 |
| C | Oct 8, 2010 to Oct 13, 2010 | Additional Costs - NPC Shop Repairs to Mtbm | $  264,304.75 |
| D | Oct 8, 2010 to Oct 14, 2010 | Additional Costs incurred during Mtbm Repairs and Relaunching Mtbm. | $  152,130.39 |
| E | Sept 25, 2010 to Dec 1, 2010 | SPR Additional Costs for support to Install, Maintain and Close Recovery Shaft | $  308,047.13 |
| F | Sept 8th, 2010 to Nov 8th, 2010 | Additional Costs associated with Microtunneling due to the DSC's | $  343,339.77 |
| | | **Requested for Change - Total Costs** | **$  1,478,730.33** |

*Id.* at 5.

## IV. THE DISPUTE REVIEW BOARD PROCEEDINGS

After the SFPUC refused to execute a change order on Nada's Request for Change, the SFPUC, Rados, and Nada, in accordance with the prime contract between the SFPUC and Rados, submitted the dispute to a Dispute Review Board ("DRB"). *Id.* The DRB, which was established by the prime contract between the SFPUC and Rados and whose purpose was "to assist the parties by facilitating the timely resolution of disputes relating to" work on the Project, consisted of one member selected by the SFPUC, one member selected by Rados, and a third member selected by the other two members. *Id.*, Ex. G ("DRB Specification"), ECF No. 71-9 ¶¶ 1.1, 2.3. Each DRB member was required to hold a certification or pre-qualification from the Dispute Resolution Board Foundation or the American Arbitration Association evidencing that the member received training the DRB process and meets the requirements for DRB members. *Id.* ¶ 3.2.

The DRB review process proceeds as follows. Either party to the prime contract could initiate the DRB's review of a dispute. *Id.* ¶ 7.2. The DRB then sets deadlines for the parties to provide pre-hearing submittals, which are position papers supported by evidence, and for a hearing. *Id.* ¶ 7.3, 7.4. The pre-hearing submittal contains a brief statement of the dispute, a summary of the party's position and the basis and justification for that position (with reference to contractual language and other evidence), and cost details. *Id.* ¶ 7.4.

The DRB then conducts a formal hearing that is attended by the parties. *Id.* ¶ 2.2. Attorneys are

UNITED STATES DISTRICT COURT
For the Northern District of California

not allowed to attend the DRB hearing without prior written approval, and if they are granted such

approved, they may only observe.  *Id.* ¶ 8.4.  The party who referred the dispute to the DRB presents

its position first, followed by the other party.  *Id.* ¶ 8.5.  Both parties are then allowed successive

rebuttals until the DRB believes that all aspects of the dispute have been fully and fairly covered.

*Id.*  The DRB members may ask questions, request clarification, or ask for additional information.

*Id.*  Either party may request that the DRB direct a question to, or request a clarification from, the

other party, although the DRB will not allow one party to be directly questioned by the other party.

*Id.*  The DRB, in its sole discretion, may allow the introduction of arguments, exhibits, handouts, or

documentary evidence that were not included in a party's pre-hearing submittal or were not

previously given to the other party.  *Id.*  In the latter circumstance, the other party is given time to

review the new material and prepare a rebuttal.  *Id.*  With prior disclosure, a party may also offer an

analysis of an outside expert.  *Id.* ¶¶ 8.8, 8.9.  In difficult or complex cases, the DRB may find an

additional hearing to be necessary.  *Id.* at ¶ 8.5.

After the formal hearing, the DRB issues a nonbinding, written recommendation (the "DRB

Report"), which is admissible in subsequent litigation or other dispute resolution proceedings.  *Id.* ¶

2.5.  The recommendation in the DRB Report is based on the pertinent contractual provisions,

applicable laws and regulations, and facts and circumstances of the dispute.  *Id.* ¶ 9.1.  It includes an

explanation of the DRB's reasoning in reaching the recommendation.  *Id.*  The recommendation

must be consistent with the application provisions of the prime contract between the SFPUC and

Rados.  *Id.*  Within 10 days of receiving the DRB Report, either party may request clarification or

reconsideration.  *Id.* ¶¶ 9.5, 9.6.  Within 30 days of receiving the DRB Report, the parties must

submit their written acceptance or rejection of the recommendation contains within it.  *Id.* ¶ 9.7.  In

the event that the DRB process does not result in a resolution of the dispute, Rados must comply

with the certified claim requirements set forth in the prime contract and with the San Francisco

Administrative Code and other applicable laws.  *Id.* ¶ 10.1.

In accordance with the procedures outlined above, the parties submitted a factual record of

"Common Reference Documents" relevant to the Project and the MTBM's immobilization.  JSUF,

ECF No. 71-2 at 5.  On November 14, 2011, Nada submitted a Pre-Hearing Submittal to the DRB,

1  executed by Nada's president, Cal Terassas, explaining Nada's position as to the cause of the

2  MTBM's immobilization (essentially, site conditions).  *Id.*  Nada also provided an Appendix of

3  separate documents to the DRB.  *Id.*  Among other analyses and reports provided in the Appendix,

4  Nada provided the DRB with expert reports authored by David Mathy and David Bennett, "two very

5  respected industry professionals who devote their careers to geotechnical issues and most

6  substantively to microtunnelling." *Id.*  Nada also created PowerPoint presentations that it submitted

7  to the DRB on November 28, 2011 and in rebuttal on December 1, 2011, after the DRB's hearing.

8  *Id.* at 6.

9      The DRB conducted a hearing on November 29, 2011 and issued its recommendation on January

10  6, 2012.  *Id.*  The DRB's decision made recommendations concerning Nada's entitlement to the

11  costs requested in Nada's Request for Change.  *Id.*

12  **V.  THE SETTLEMENT OF THE CHANGE ORDER DISPUTE**

13      As a result of the DRB's January 6, 2012 recommendation, the SFPUC agreed to pay Rados the

14  sum of $850,000.  JSUF, ECF No. 71-2 at 6.  Rados then agreed to pay Nada $481,755.49 ($850,000

15  less deductions for a $350,000 Rados back charge and $18,244.51 in DRB charges).  *Id.*  Nada's

16  final progress billing to Rados reflects a line item credit of $850,000 to Nada and debits for the

17  Rados back charge and DRB costs for net billing of $481,755.49 and a net balance due under the

18  Nada-Rados subcontract of $847,383.74.  *Id.*  Rados paid Nada the $847,383.74 outstanding on the

19  subcontract by check dated July 10, 2012.  *Id.*  The $850,000 credit (and net payment of

20  $481,755.49) that Nada received from Rados compensated Nada for no costs other than the costs

21  categorized as items A-F on the chart shown above.  *Id.*

22      Nada has no obligation—existing, inchoate, contingent, or otherwise—to repay either Rados or

23  the SFPUC for the $850,000 credit or $481,755.49 net payment that Nada received in settlement of

24  its Request for Change.  *Id.*  Nada did not purchase insurance or pay insurance premiums to either

25  Rados or the SFPUC in exchange for the credit and payment it received in settlement of its Request

26  for Change.  *Id.* at 6-7.

27  **VI.  THE DAMAGES NADA SEEKS IN THIS LITIGATION**

28      In this litigation, Nada seeks to recover the following categories of costs in the amounts shown

UNITED STATES DISTRICT COURT
For the Northern District of California

below:

| Item | Date of work | Description of Work | Costs Incurred |
|------|--------------|---------------------|----------------|
| A | September 21, 2010 to September 24, 2010 | Costs related to initial lockup of MTBM cutter bit and efforts to free MTBM | $144,061.23 |
| B | September 27, 2010 to October 7, 2010 | Costs incurred during installation of recovery shaft | $266,847.06 |
| C | October 8, 2010 to October 12, 2010 | NPC shop repairs to MTBM | $246,346.89 |
| D | October 8, 2010 to October 14, 2010 | Costs incurred during MTBM repairs and relaunching MTBM | $152,130.39 |
| E | September 25, 2010 to December 1, 2010 | Costs incurred for support to install, maintain and close recovery shaft | $308,047.13 |
| F | October 15, 2010 to October 22, 2010 | Additional costs incurred during relaunch of MTBM | $252,122.07 |
| | | **Total** | **$1,369,554.84** |

*Id.* at 7.  The categories and amounts of costs listed in items A-F of Nada's damages disclosures are identical to the categories and amounts of costs listed in items A-F of Nada's Request for Change as summarized in the previous chart, except that Nada deducted from item C of Nada's damage disclosures costs that Nada incurred for cutter head repairs and deducted from item F additional costs that Nada incurred after the MTBM had been re-launched.  *Id.*

**VII.  NADA'S CLAIMED PROPERTY DAMAGE**

For purposes of California's economic loss rule, Nada claims that it suffered four items of damage to property other than the MTBM as a result of the MTBM's immobilization:

First, Nada claims that it suffered damage to the cutter head in that the MTBM's immobilization caused the cutter head to be "effectively 'lost' underground unless and until the MTBM could be rescued." *Id.* at 7-8.

Second, Nada claims that it suffered damage to the pipe lengths installed in the tunnel at the time the MBTM failed in that the MTBM's immobilization caused the pipe lengths to be "effectively

'lost' underground unless and until the MTBM could be rescued since they could not be used for their intended purpose (or any purpose)." *Id.* at 8.

Third, Nada claims that it suffered damage to its "license to use the property of SFPUC" in that "Nada was unable to use its contractual license to use the real property owned by SFPUC unless and until the MTBM could be rescued, and Nada had a contractual duty to promptly remedy and/or repair the immobilized MTBM's interference with the tunnel profile." *Id.*

Fourth, and finally, Nada claims that it suffered damage to its "lease obligations to Walter C. Smith and Akkerman" in that "when the MTBM became immobilized due to a gear box failure, the MTBM that Nada had leased from Akkerman, and the increase kit that Nada had leased from Walter C. Smith, were effectively 'lost' underground unless and until the MTBM, and the attached increase kit could be rescued." *Id.*

Nada claims no other elements of damage to "other property" within the meaning of California's economic loss rule. *Id.*

## VIII.  PROCEDURAL HISTORY

Nada filed its original complaint, which named only Besser as a defendant, on September 18, 2013. Nada Original Complaint, ECF No. 1. On October 4, 2013, Nada filed its First Amended Complaint, which added PEM as a defendant. Nada Complaint, ECF No. 6. Against Besser, Nada brings claims for strict liability based on a manufacturing defect, negligence in the context of products liability, equitable indemnity, fraud, and negligent misrepresentation. *See id.* ¶¶ 43-87.

On September 11, 2014, Besser filed the instant motion for summary judgment. Motion, ECF No. 71. Nada filed an opposition on September 25, 2014, and Besser filed a reply on October 2, 2014. Opposition, ECF No. 84; Reply, ECF No. 89. The court held a hearing on the matter on November 6, 2014. 11/6/14 Minute Order, ECF No. 100.

ANALYSIS

## I.  THE SUMMARY JUDGMENT LEGAL STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material

UNITED STATES DISTRICT COURT
For the Northern District of California

1   facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

2   a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

3   the non-moving party. *Id.* at 248-49.

4       The party moving for summary judgment bears the initial burden of informing the court of the

5   basis for the motion, and identifying portions of the pleadings, depositions, answers to

6   interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

7   fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party

8   must either produce evidence negating an essential element of the nonmoving party's claim or

9   defense or show that the nonmoving party does not have enough evidence of an essential element to

10  carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

11  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

12  (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

13  only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

14  (quoting *Celotex*, 477 U.S. at 325).

15      If the moving party meets its initial burden, the burden shifts to the non-moving party to produce

16  evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103.

17  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

18  but instead must produce admissible evidence that shows there is a genuine issue of material fact for

19  trial. *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a

20  genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S.

21  at 323.

22      In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

23  viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith*

24  *Radio Corp.*, 475 U.S. 574, 587 (1986).

25  **II. JUDICIAL ESTOPPEL**

26      Besser first argues that Nada should be judicially estopped from asserting any of its claims

27  against Besser because its factual allegations and theory of recovery in this action contradict the

28  factual allegations and theory of recovery that it presented to the DRB and which led to a settlement

in its favor.  *See* Motion, ECF No. 71 at 7, 9-16.  If Nada is estopped from asserting its current

theory, then it will not be able to prove that the cast iron planetary carrier manufactured by Besser

caused the harm for which it seeks relief, and therefore its claims against Besser necessarily fail.

*See id.* at 7, 16.[2]

Federal law on judicial estoppel governs cases in federal courts regardless of whether they

involve state law claims.  *Johnson v. Oregon Dep't of Human Res. Rehab. Div.*, 141 F.3d 1361,

1364 (9th Cir. 1998); *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir.

1996).  Judicial estoppel is an equitable doctrine that prevents a party from benefitting by taking one

position but then later seeking to benefit by taking a clearly inconsistent position.  *Hamilton v. State

Farm Fire & Cas. Ins. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  It "applies to positions taken in the

same action or in different actions," *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 935 (9th Cir.

2010) (citing *Rissetto*, 94 F.3d at 603)), and is intended to protect the integrity of the judicial process

by preventing a litigant from "playing fast and loose with the courts," *Russell v. Rolfs*, 893 F.2d

1033, 1037 (9th Cir. 1990).  "It also 'applies to a party's stated position whether it is an expression

of intention, a statement of fact, or a legal assertion.'"  *Samson*, 637 F.3d at 935 (quoting *Wagner v.

Prof'l Eng'rs in California Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004)).

Judicial estoppel may be invoked by the court at its discretion.  *Morris v. California*, 966 F.2d

448, 453 (9th Cir. 1991).  Several factors help determine whether judicial estoppel applies.

*Hamilton*, 270 F.3d  at 782 (citing *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).  "'First,

a party's later position must be 'clearly inconsistent' with its earlier position.'"  *Id.* (quoting *New

---

[2] A party may assert the doctrine of judicial estoppel in a motion for summary judgment to bar a claim based on an inconsistent position.  *See Elston v. Westport Ins. Co.*, 253 Fed. Appx. 697, 699 (9th Cir. 2007) (affirming the district court's grant of summary judgment against plaintiff on the basis that her claims were barred by judicial estoppel).  A party seeking to defeat summary judgment on judicial estoppel grounds must "sufficiently explain" a prior judicial position that is inconsistent with an essential element of its claim.  *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999) (a party must "provide a sufficient explanation" for a prior inconsistent position to defeat summary judgment); *Fewer v. Copper & Brass Sales, Inc.*, 183 Fed. Appx. 696, 696 (9th Cir. June 9, 2006) ("Because Fewer failed to 'proffer a sufficient explanation' to the district court for these inconsistent positions, the court did not abuse its discretion applying the doctrine of judicial estoppel.").

UNITED STATES DISTRICT COURT
For the Northern District of California

*Hampshire*, 532 U.S. at 750).  Second, the party must have "'succeeded in persuading a court to accept that party's earlier position.'"  *Id.* at 782 (quoting *New Hampshire*, 532 U.S. at 750).  "'Third, the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"  *Id.* (quoting *New Hampshire*, 532 U.S. at 751).  These factors, however, are not "'inflexible prerequisites or an exhaustive formula'" because "'[a]dditional considerations may inform the doctrine's application in specific factual contexts.'"  *Id.* (quoting *New Hampshire*, 532 U.S. at 751).  For example, another factor that has been considered is whether the party to be estopped acted inadvertently or with an intent to defraud the court or creditors.  *Johnson*, 141 F.3d at 1369 ("If incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply.");  *see Samson*, 637 F.3d at 935.

But before the court applies these (and other) factors, it must determine whether judicial estoppel can be applied when the allegedly inconsistent position was taken before the DRB.  The Ninth Circuit has made clear that the doctrine of judicial estoppel applies not only where prior inconsistent statements were made to a court, but also where those statements were made in an administrative proceeding.  *See Rissetto*, 94 F.3d at 604 (noting that "[t]hough called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding" and holding that "the doctrine of judicial estoppel is not rendered inapplicable in this case by the fact that plaintiff's prior position was taken in a workers' compensation proceeding rather than in a court"); *see also Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 291 (6th Cir. 1968) (workers' compensation proceeding); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152, 1184-85 (C.D. Cal. 2008) (California inheritance tax appraiser); *Simo v. Home Health & Hospice Care*, 906 F. Supp. 714, 718 (D.N.H. 1995) (Social Security Administration disability proceeding); *UNUM Corp. v. United States*, 886 F. Supp. 150, 158 (D. Me. 1995) (Maine Bureau of Insurance approval proceeding); *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth.*, 731 F. Supp. 747, 750 (E.D. La. 1990) (Interstate Commerce Commission proceeding).  And at least one court has applied the doctrine where the inconsistent position was taken before the United States Patent and Trademark Office.  *See Synopsys, Inc. v. Magma Design Automation, Inc.*, C 04–3923

1    MMC, 2007 WL 322353, at *25-26 (N.D. Cal. Jan. 31, 2007) (applying the doctrine with respect to

2    prior statements made to the U.S. Patent and Trademark Office); *cf. Lampi Corp. v. Am. Power*

3    *Prods., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000) (stating that "we are troubled by the

4    inconsistencies between [the plaintiff's] statements to the PTO . . . and the position taken by [the

5    plaintiff] in this litigation," but ultimately affirming the decision not to judicially estop the plaintiff

6    where the district court found that the plaintiff's inconsistencies were inadvertent). "This rule has

7    been justified on the ground that '[t]he truth is no less important to an administrative body acting in

8    a quasi-judicial capacity than it is to a court of law.'" *Rissetto*, 94 F.3d at 604 (quoting *Muellner v.*

9    *Mars, Inc.*, 714 F. Supp. 351, 357 (N.D. Ill. 1989)).

10       Besser cites many of these opinions and argues that the DMB proceeding likewise is a "quasi-

11   judicial" proceeding such that judicial estoppel may be applied.  *See* Reply, ECF No. 89 at 8-9.  The

12   court disagrees.  It is true that the DRB proceeding had many of the hallmarks of a judicial or quasi-

13   judicial-proceeding: it was adversarial; the parties submitted briefs making arguments and citing to

14   evidence; the parties could respond to each other's arguments; the parties could submit the opinions

15   of experts; etc.  But it lacked the most important hallmark—the ability to make a decision.[3]  In all of

16

17   _____

18       [3] Although there does not appear to be an opinion holding that judicial estoppel applies only
     to instances where the prior, allegedly inconsistent position was taken before a quasi-judicial body
19   that has decision-making authority, opinions in other contexts certainly suggest that the ability to
     make a decision is critical to determining whether that body is acting in quasi-judicial capacity.  *See*
20   *United States v. MacDonald*, 585 F.2d 1211, 1212 (4th Cir.1978) (recognizing in the double
     jeopardy context that a military, investigatory hearing which did not adjudicate the defendant's guilt
21   or innocence but rather offered only a recommendation to the Commanding Officer as to the charges
     against the defendant did not permit jeopardy to attach); *Eaton v. Siemens*, No. CIV. S-07-315 FCD
22   KJM, 2007 WL 1500724, at *3-6 (E.D. Cal. May 23, 2007) (finding that an arbitrator's "advisory
     decision" (i.e., a recommendation) to a city manager for his use in deciding plaintiff's appeal of the
23   termination of his employment did not bar under res judicata the plaintiff's subsequent action in
     district court); *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 n.4 (D. Conn. 1975) (recognizing that
24   federal common law rules of preclusion apply only to state administrative decisions that are "judicial
     in nature" and that the administrative hearing was not "an adversary proceeding in which the
25   Commissioner was empowered to adjudicate rights of the parties before him" but rather, the hearing
     was an "advisory proceeding designed to help the Commissioner make his decision"); *cf. Lambert v.*
26   *Andrews*, 2003 WL 22508205, at *1 (9th Cir. Oct. 31, 2005) (finding that the Nevada State
     Personnel Commission "clearly act[ed] in a judicial capacity" because, among other reasons, the
27   Commission's decision was "binding on both parties").

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the opinions cited above, the deliberative bodies all had the power to make a decision.  The workers'

2    compensation appeals board in *Rissetto* approved the plaintiff's claim for disability benefits.  94

3    F.3d at 600.  The Workmen's Compensation Commission in *Smith* did the same thing.  388 F.2d at

4    292.  The California inheritance tax appraiser in *Milton H. Greene Archives* made a determination of

5    the decedent's residence, assessed the amount of inheritance tax to be paid, and submitted a report to

6    the superior court (which could then approve or reject the decision in that report).  568 F. Supp. 2d

7    at 1185.  The Social Security Administration in *Simo* awarded the plaintiff permanent disability

8    benefits.  906 F. Supp. at 716.  The Maine Bureau of Insurance in UNUM approved the plaintiff's

9    proposed conversion from a mutual insurance company into a stock insurance company.  886 F.

10   Supp. at 156.  The Interstate Commerce Commission in *Zapata Gulf Marine* granted the assignor's

11   petition to discontinue a tariff investigation.  731 F. Supp. 748-49.  And the United States Patent and

12   Trademark Office in *Synopsys* issued two patents that were applied for.  2007 WL 322353, at *17.

13         The DRB had no such power.  Instead, it was empowered "to assist the parties by facilitating the

14   timely resolution of disputes" and was limited to issuing a nonbinding (albeit written)

15   recommendation that the SFPUC, Rados, and Nada could accept or reject.  DRB Specification, ECF

16   No. 71-9 ¶¶ 1.1, 2.5, 9.7.  The DRB Specification itself even recognized that possibility that the

17   DRB process might not result in a resolution of the dispute.  *Id.* ¶ 10.1.  If the DRB process itself

18   might not result in a resolution of the dispute, it certainly cannot be considered to have adjudicated

19   it.  Besser cites no authority holding, or even suggesting, that the doctrine of judicial estoppel may

20   be applied in the context of a body with no power to make a decision that is binding on the parties

21   before it.  Without it, and after considering the authority on this issue, the court will not judicially

22   estop Nada from asserting its claims against Besser.[4]

23   **III. COLLATERAL SOURCE RULE**

24         Besser next argues that Nada's potential recovery must be offset by the money is received from

25   the settlement with the SFPUC and Rados.  *See* Motion, ECF No. 71 at 16-20.  Besser asserts that

26

27   ───────────────

28         [4] Because the court finds that the doctrine of judicial estoppel does not apply in this context,
     the court has no occasion to address the parties' arguments about whether the judicial estoppel
     factors support its exercise here.

1    because Nada (according to Nada's own calculations) received $680,627.07 from Rados (which

2    received the payment from SFPUC), it is limited to recovering $688,927.70 from Besser in this

3    action. *See* Reply, ECF No. 89 at 11.[4]  Nada contends that its potential recovery is not so limited

4    because California's so-called "collateral source rule" applies here.  See Opposition, ECF No. 84 at

5    18-22.

6        Normally, a plaintiff is "entitled to no more than a single recovery for each distinct item of

7    compensable damages supported by the evidence," "[r]egardless of the nature and number of legal

8    theories advanced by the plaintiff."  *Tavaglione v. Billings*, 4 Cal. 4th 1150, 1158-59 (1993) (citing

9    *Shell v. Schmidt*, 126 Cal. App. 2d 279, 291 (Cal. Ct. App. 1954)).  Thus, "[d]ouble or duplicative

10   recovery for the same items of damage amounts to overcompensation and is therefore prohibited."

11   *Id.* at 1159 (citing *Shell*, 126 Cal. App. 2d at 291).  But under the collateral source rule, "if an

12   injured party receives some compensation for his injuries from a source wholly independent of the

13   tortfeasor, such payment should not be deducted from the damages which the plaintiff would

14   otherwise collect from the tortfeasor."  *Helfand. v. S. Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 6 (1970).

15       In *Helfand*, the plaintiff was injured by a tortfeasor during an automobile collision.  *Id.* at 4.  The

16   plaintiff sued the tortfeasor and asserted damages that included his medical expenses.  *Id.* at 5.  The

17   tortfeasor wanted to introduce evidence showing that the plaintiff's medical insurance carrier paid

18   about 80% of the plaintiff's medical bills and that other insurance carriers may have paid for some

19   of the rest.  *Id.*  Based on this evidence, the tortfeasor argued that the collateral source rule did not

20   apply and thus the money that the plaintiff sought to recover from him should be offset by the

21

22       [4] In its motion, Besser argued that, because the SFPUC paid $850,000 to Rados (which in

23   turn paid $481,755.49 to Nada because Rados deducted $350,000 for a back charge and $18,244.51
     in DRB charges), Nada's recovery in this action must be offset by $850,000 and thus was limited to

24   $519,554.77.  *See* Motion, ECF No. 71 at 17, 19-20.  In its opposition, Nada argued that the amount

25   of any offset was disputed issue of material fact and stated that not all of the $850,000 was
     duplicative of amounts it claims in this action.  *See* Opposition, ECF No. 84 at 21.  It further stated

26   that only $680,627.07 of the $850,000 was received for damages that Nada also claims in this action,
     leaving a potential recovery of at least $688,927.70.  *See id.* at 22.  In its reply, to avoid the disputed

27   issue of material fact, Besser adopted Nada's calculations and argued that Nada's recovery in this

28   action is limited to $688,927.70.  *See* Reply, ECF No. 89 at 11.  Neither party mentioned this issue
     at the hearing.

1   money that the plaintiff received from his insurance carriers.  *Id.*

2   The superior court rejected the tortfeasor's argument, and the California Supreme Court affirmed

3   that decision.  *Id.* at 14.  In concluding that the collateral source rule did in fact apply to this

4   situation, the Court reasoned that the plaintiff "received benefits from his medical insurance

5   coverage only because he had long paid premiums to obtain them."  *Id.* at 9.  "Such an origin," the

6   court found, "constitute[s] a completely independent source."  *Id.*  It went on to note that application

7   of the collateral source rule in this situation "embodies the venerable concept that a person who has

8   invested years of insurance premiums to assure his medical care should receive the benefits of his

9   thrift."  *Id.* at 9-10.  When this is the case, "[t]he tortfeasor should not garner the benefits of his

10  victim's providence."  *Id.* at 10.  The Court further explained that this application of the collateral

11  source rule was supported by public policy considerations:

12          The collateral source rule expresses a policy judgment in favor of encouraging
            citizens to purchase and maintain insurance for personal injuries and for other
13          eventualities.  Courts consider insurance a form of investment, the benefits of which
            become payable without respect to any other possible source of funds.  If we were to
14          permit a tortfeasor to mitigate damages with payments from plaintiff's insurance,
            plaintiff would be in a position inferior to that of having bought no insurance,
15          because his payment of premiums would have earned no benefit.  Defendant should
            not be able to avoid payment of full compensation for the injury inflicted merely
16          because the victim has had the foresight to provide himself with insurance.

17  *Id.*  For these reasons, the Court "reaffirm[ed] our adherence to the collateral source rule in tort cases

18  in which the plaintiff has been compensated by an independent collateral source—such as insurance,

19  pension, continued wages, or disability payments—for which he had actually or constructively . . .

20  paid or in cases in which the collateral source would be recompensed from the tort recovery through

21  subrogation, refund of benefits, or some other arrangement."  *Id.* at 13-14.

22  Besser rightly points out that this case has none of the characteristics of the cases in which the

23  collateral source rule has been applied.  "While commonly applied to exclude evidence of insurance

24  payments, over the years, a variety of benefits provided to plaintiffs have been held to be collateral

25  sources of compensation that should not be considered in mitigation of a plaintiff's damages."

26  *Smock v. State*, 138 Cal. App. 4th 883, 886-87 (Cal. Ct. App. 2006) (citing *Helfend*, 2 Cal. 3d at 9-

27  14 (medical insurance benefits); *Fifield Manor v. Finston*, 54 Cal. 2d 632, 637 (1960) (value of

28  gratuitous medical services); *McKinney v. California Portland Cement Co.*, 96 Cal. App. 4th 1214,

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1220 (Cal. Ct. App. 2002) (social security and pension benefits); *Arambula v. Wells*, 72 Cal. App. 4th 1006, 1008 (Cal. Ct. App. 1999) (continued wages paid by an employer); *Pac. Gas & Elec. Co. v. Superior Court*, 28 Cal. App. 4th 174, 176-177 (Cal. Ct. App. 1994) (fidelity insurance proceeds); *Hanif v. Housing Authority*, 200 Cal. App. 3d 635, 644 (Cal. Ct. App. 1988) (value of home care provided by a child's parents); *Rodriguez v. McDonnell Douglas Corp.*, 87 Cal. App. 3d 626, 662 (Cal. Ct. App. 1978) (value of nursing services provided by a spouse); *Tremeroli v. Austin Trailer Equip. Co.*, 102 Cal. App. 2d 464, 482 (Cal. Ct. App. 1951) (continued wages paid by an employer)).  Besser also cites an opinion that suggests that additional money paid to a contractor pursuant to a change order does not constitute money from a collateral source, although this opinion does not discuss the issue in detail.  *See Huber, Hunt & Nichols, Inc. v. Moore*, 67 Cal. App. 3d 278, 304 (Cal. Ct. App. 1977).

For its part, Nada cites no authority holding or even suggesting that the collateral source rule should be applied in the circumstances present here.  Instead, it relies on *Helfand* for its general summary of the collateral source rule—that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor," 2 Cal. 3d at 6—but it ignores both the facts of that case and the Court's express limitation of its holding, *see id.* at 6 n.3 ("There are many sorts of collateral sources and a great variety of contexts in which the 'rule' might be applied.  We expressly do not consider or determine the appropriateness of the rule's application in the myriad of possible solutions which we have not discussed or which are not presented by the facts of this case."); *see also Arambula*, 72 Cal. App. 4th at 1010-11 (noting that the California Supreme Court specifically limited *Helfand*'s holding to the facts of that case and stating that *Helfand* thus should be construed narrowly); *Kirtland & Packard v. Superior Court*, 59 Cal. App. 3d 140, 145 (Cal. Ct. App. 1976) (recognizing that the California Supreme Court "expressly disavowed any intent to extend the collateral source rule beyond the particular facts of *Helfand*").

It also tries to analogize this case to *Helfand* by arguing that the SFPUC and Rados cannot be considered "other tortfeasors" for purposes of the collateral source rule and were "wholly

independent" from Besser (the alleged tortfeasor)  because SFPUC and Rados had to pay Nada

Pacific pursuant to California Public Contracts Code § 7104.  That statute provides:

> Any public works contract of a local public entity which involves digging trenches or other excavations that extend deeper than four feet below the surface shall contain a clause which provides the following:
>
> (a) That the contractor shall promptly, and before the following conditions are disturbed, notify the local public entity, in writing, of any:
>
>> (1) Material that the contractor believes may be material that is hazardous waste, as defined in Section 25117 of the Health and Safety Code, that is required to be removed to a Class I, Class II, or Class III disposal site in accordance with provisions of existing law.
>>
>> (2) Subsurface or latent physical conditions at the site differing from those indicated by information about the site made available to bidders prior to the deadline for submitting bids.
>>
>> (3) Unknown physical conditions at the site of any unusual nature, different materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract.
>
> (b) That the local public entity shall promptly investigate the conditions, and if it finds that the conditions do materially so differ, or do involve hazardous waste, and cause a decrease or increase in the contractor's cost of, or the time required for, performance of any part of the work shall issue a change order under the procedures described in the contract.
>
> (c) That, in the event that a dispute arises between the local public entity and the contractor whether the conditions materially differ, or involve hazardous waste, or cause a decrease or increase in the contractor's cost of, or time required for, performance of any part of the work, the contractor shall not be excused from any scheduled completion date provided for by the contract, but shall proceed with all work to be performed under the contract. The contractor shall retain any and all rights provided either by contract or by law which pertain to the resolution of disputes and protests between the contracting parties.

Cal. Pub. Contracts Code § 7104.  In other words, Nada Pacific received money from the SFPUC

and Rados under statutory/contract theory, not a tort theory.

Even so, the larger point is that the facts of this simply are different from the situations where

courts have applied the collateral source rule.  Nada was not "compensated by an independent

collateral source—such as insurance, pension, continued wages, or disability payments—for which

he had actually or constructively . . . paid," and the SFPUC will not be "recompensed from the tort

recovery through subrogation, refund of benefits, or some other arrangement."  *Helfand*, 2 Cal. 3d at

13-14.  As explained in *Helfand*, the collateral source rule is a limited exception to the more general

1   rule against duplicate recoveries, and the court does not believe that the rule applies here.  To the

2   extent that Nada tries to come within *Helfand* by arguing that it "constructively 'paid' for the right

3   to receive [the additional compensation that Rados received under the change order] by promising to

4   perform, and actually performing, its work under [its subcontract with Rados]," *see* Opposition, ECF

5   No. 84 at 20, it provides no evidence to support this assertion.

6       Accordingly, the court finds that Nada is limited to recovering $688,927.70 from Besser in this

7   action.

8   **IV.  ECONOMIC LOSS RULE**

9       Finally, Besser argues that California's so-called "economic loss rule" bars the tort claims that

10  Nada brings against it.  See Motion, ECF No. 71 at 20-23.

11      In California, "[t]he economic loss rule requires a purchaser to recover in contract for purely

12  economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond

13  a broken contractual promise."  *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988

14  (2004).  "Economic loss consists of damages for inadequate value, costs of repair and replacement

15  of the defective product or consequent loss of profits—without any claim of personal injury or

16  damages to other property."  *Id.* (internal citations and ellipses omitted).  Under the rule, a plaintiff

17  may recover in tort only where he or she can allege personal injury or "damage to 'other property,'

18  that is, property *other than the product itself*."  Jimenez v. Superior Court, 29 Cal.4th 473, 482-83

19  (2002) (emphasis in original).  "The function of the economic loss rule is to prevent tort law from

20  shifting back to sellers a specific risk that better rests with buyers—the risk that a product will not

21  perform to a particular level beyond that warranted by the seller.  If a buyer desires protection

22  against this risk, she can and should negotiate for a higher warranty or seek it out from other sellers

23  in the marketplace."  *Robinson*, 34 Cal.4th at 997 (2004) (Werdegar, J., dissenting) (citing *Seely v.*

24  *White Motor Co.*, 63 Cal. 2d 9, 18-19 (1965)).

25      Nada asserts only tort claims against Besser, and through this action it seeks only economic

26  damages that cannot be recovered through them.  It is undisputed that the damages to "other

27  property" that Nada seeks are based on its inability to use the MTBM's cutter head, the pipe lengths

28  installed in the tunnel behind the MTBM, its "license to use the property of SFPUC," and its "lease

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  obligations to Walter C. Smith and Akkerman" while the MTBM was stuck underground.  Nada

2  cites several opinions that make clear that, to avoid the economic loss rule, the damage to "other

3  property" must be physical damage.  *See, e.g., Jimenez*, 29 Cal. 4th at 482-83; *County of Santa

4  Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 320 (Cal. Ct. App. 2006); *KB Home v. Superior

5  Court*, 112 Cal. App. 4th 1076, 1084 (Cal. Ct. App. 2003); *see also City of Pomona v. SQM N. Am.

6  Corp.*, 70 F.3d 1036, 1050 (9th Cir. 2014) (economic loss rule did not bar the plaintiff's claims

7  where the plaintiff alleged physical damage (contamination) to its groundwater).  It also cites several

8  opinions holding that the "loss of use" of "other property" does not constitute physical damage to it;

9  instead, it constitutes an economic loss.  *See Anthony v. Kelsey-Hayes Co.*, 25 Cal. App. 3d 442, 447

10  (Cal. Ct. App. 1972) (the defendant's defective wheels, which were installed in the plaintiff's trucks,

11  made the trucks unuseable and resulted in a business loss; the court affirmed the Superior Court's

12  determination that the plaintiff's loss of use of the trucks was an economic loss for which the

13  plaintiff must recover under contract law); *see also Casden Builders Inc. v. Entre Prises USA, Inc.*,

14  No. CV 10-2353 ODW (CWx), 2010 WL 2889496, at *3-4 (C.D. Cal. July 21, 2010) (the

15  defendant's defective product, which was installed in the plaintiff's climbing wall, rendered the wall

16  inoperable; the court applied California's economic loss rule, concluded that the plaintiff's loss of

17  use of its climbing wall was an economic loss, and dismissed with prejudice the plaintiff's tort

18  claim); *W./Scott Fetzer Co. v. Braden Partners, LP*, No. C-03-4114 VRW, 2006 WL 2263827, at *5

19  (N.D. Cal. Aug. 7, 2006) (the defendant's defective valve allowed oxygen in the plaintiff's oxygen

20  cylinders to escape, causing a business loss; the court noted that California's economic loss rule "is

21  intended to ensure that redress for lost property alone, unaccompanied by collateral harm, may only

22  be sought under contract law," found that the loss of the oxygen did not constitute physical harm to

23  it, and entered summary judgment in the defendant's favor on the plaintiff's negligence claim); *cf. N.

24  Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 777 n.8 (Cal. Ct. App. 1997) ("Although

25  purely economic loss usually occurs in the form of lost profits, it may also include consequential

26  damages, loss of expected proceeds, lost opportunities, diminution in the value of the allegedly

27  defective property, the costs of repair and replacement, loss of use, loss of goodwill, and damages

28  paid to third parties as a result of a defendant's negligence.").

1     With the exception of *W./Scott Fetzer*, Nada ignores the authorities cited by Besser.  *See*

2   Opposition, ECF No. 84 at 22-29.  As for *W./Scott Fetzer*, Nada says that the escaped oxygen at

3   issue there was gone forever, while here it contends that the "other property" was "physically

4   restrained and/or blocked."  Id. at 23.  The court fails to see a meaningful distinction; in both

5   instances, the "other property" was made unusable.

6     Nada also cites *Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Badge Co.*, 639 F.3d 207

7   (5th Cir. 2011), where the plaintiff, the owner of a hydroelectric station, suffered damages after the

8   defendant's boat caused a collision which in turn caused less water to flow into the plaintiff's

9   station.  *Id.* at 209.  Because less water flowed into the station, the plaintiff produced less electricity

10   than usual.  *Id.*  The plaintiff brought tort claims against the defendant to recover damages for the

11   value of the electricity that it was not able to generate.  *Id.* at 210.  The Fifth Circuit found that the

12   plaintiff's tort claims were not barred by the economic loss rule.  *Id.* at 211, 214.  But the ruling is

13   inapposite because in *Catalyst*, the Fifth Circuit was applying the economic loss rule under federal

14   maritime law.  *See id.* at 210.  That rule states that "there can be no recovery for economic loss

15   absent physical damage to <u>or an invasion of</u> a proprietary interest."  *Id.* (citing *Robins Dry Dock &*

16   *Repair Co. v. Flint*, 275 U.S. 303, 308-09 (1927); *Louisiana ex. rel. Guste v. M/V TESTBANK*, 752

17   F.2d 1019, 1029 (5th Cir. 1985)) (emphasis added).  California's economic loss rule is narrower than

18   the federal maritime one because the California rule does not allow recovery for the invasion of a

19   proprietary interest.  Instead, as discussed above, it requires physical damage.

20     In addition, Nada cites *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App.

21   4th 847, 866 (Cal. Ct. App. 2000), for its statement that "California courts have held that the

22   presence of something where it should not be can constitute property damage."  Opposition, ECF

23   No. 84 at 28.  But, as Besser points out, *Shade* is inapposite because the court there was construing

24   the meaning of "property damage" as defined in an insurance policy.  That opinion says nothing

25   about physical damage to "other property" for purposes of the economic loss rule.  Nada also cites

26   *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 877-84 (1997), for its statement that

27   "courts have also found other instances of a piece of 'other property' being physically harmed when

28   the defective product caused the 'other property' to be physically prevented from being used as

UNITED STATES DISTRICT COURT
For the Northern District of California

1    intended."  Opposition, ECF No. 84 at 28.  This opinion also is inapposite because there, the "other

2    property" was lost at sea when a ship sank; the "other property" was physically destroyed.  *See*

3    *Saratoga Fishing*, 520 U.S. at 877 ("This case asks us how [the economic loss rule under federal

4    maritime law] treats the physical destruction of" other property).[5]

5        Finally, Nada argues that, even if the economic loss rule bars its claims against Besser for strict

6    liability, negligence, equitable indemnity, and negligent misrepresentation, it does not bar its claim

7    for fraud.  Opposition, ECF No. 84 at 22.  Nada makes this argument in a single sentence in its

8    opposition, stating that "the courts have held that the economic loss rule does not bar fraud and

9    intentional misrepresentation claims."  *Id.* (citing *Robinson*, 34 Cal. 4th at 991).  But as Besser

10   correctly notes, *Robinson* does not state for such a broad proposition.  In *Robinson*, the plaintiff

11   made helicopters, and the defendant made clutches that the plaintiff incorporated into its helicopters.

12   34 Cal. 4th at 985.  According to the parties' contact, the defendant was supposed to ground the

13   clutches to a particular level of hardness.  *Id.*  The plaintiff needed them ground to this hardness

14   because its "type certificate" from the Federal Aviation Administration ("FAA") required it.  *Id.*

15   When the defendant made and sold the clutches to the plaintiff, the defendant included along with

16   the clutches a certificate stating that the clutches were ground to the required hardness.  *Id.* at 985-

17   86.  At a certain point, the defendant starting grinding the clutches to a different hardness—in

18   violation of the parties' contract—but it still issued certificates stating that the clutches were ground

19   to the required hardness.  *Id.* at 986.  It turned out that the clutches ground to the nonconforming

20   hardness had a much higher failure rate than those ground to the conforming hardness.  *Id.*

21       When the plaintiff found out what happened, it sued the defendant for breach of contract, breach

22   of warranty, and negligent and intentional misrepresentation.  *Id.* at 987.  The defendant argued that

23   the plaintiff's tort claims were barred by the economic loss rule, but the California Supreme Court

24

25   _____

26       [5] Nada also cites *Tasion Comm'cns, Inc. v. Ubiquiti Networks, Inc.*, No. C-13-1803 EMC,
     2013 WL 4530470, at *6 (N.D. Cal. Aug. 26, 2013) for its discussion of the factors used to
27   determine whether property is "other property" for purposes of the economic loss rule.  That
     discussion, however, presupposed that the "other property"had been physically damaged; the radios
28   at issue there were physically damaged as a result of the defendant's defective cables.  *See id.* at *2,
     *7.

C 13-04325 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1    concluded otherwise. *See id.* at 988-93.  What allowed the claims to survive was the fact that they

2    were based not on the defendant's provision of clutches that did not conform to the contract but

3    instead was based on the defendant's continued certification that the clutches were conforming when

4    it knew they were not.  *See id.* at 990-91.  As the Court explained:

5         . . . By issuing false certificates of conformance, [the defendant] unquestionably made
          affirmative representations that [the plaintiff] justifiably relied on to its detriment.
6         But for [the defendant's] affirmative misrepresentations by supplying the false
          certificates of conformance, [the plaintiff] would not have accepted delivery and used
7         the nonconforming clutches over the course of several years, nor would it have
          incurred the cost of investigating the cause of the faulty clutches.  Accordingly, [the
8         defendant's] tortious conduct was separate from the breach itself, which involved [the
          defendant's] provision of the nonconforming clutches.  In addition, [the defendant's]
9         provision of faulty clutches exposed [the plaintiff] to liability for personal damages if
          a helicopter crashed and to disciplinary action by the FAA.  Thus, [the defendant's]
10        fraud is a tort independent of the breach. (*Erlich v. Menezes*, *supra*, 21 Cal. 4th at pp.
          553–554, 87 Cal. Rptr. 2d 886, 981 P.2d 978.)

11        We hold the economic loss rule does not bar [the plaintiff's] fraud and intentional
12        misrepresentation claims because they were independent of [the defendant's] breach
          of contract.  (*See Erlich v. Menezes*, *supra*, 21 Cal. 4th at pp. 552–554, 87 Cal. Rptr.
13        2d 886, 981 P. 2d 978.)

14   *Id.* (footnote omitted).  In a footnote accompanying its holding, the Court further explained that

15        . . . [i]n contrast [to cases dealing with the economic loss rule in products liability or
          negligence contexts], [the plaintiff's] claims are based on [the defendant's]
16        intentional and affirmative misrepresentations that risked physical harm to persons.
          [The plaintiff's] helicopters are flown by and carry people.  A properly functioning
17        sprag clutch is vital to the safe performance of the aircraft, and compliance with the
          certificate requirement is part of an integrated regulatory scheme intended to ensure
18        their safe operation.  The economic loss rule is designed to limit liability in
          commercial activities that negligently or inadvertently go awry, not to reward
19        malefactors who affirmatively misrepresent and put people at risk.

20   *Id.* at n.7.  Careful not to extend the economic loss rule too far, the Court went on to make clear that

21   its holding "is narrow in scope and limited to a defendant's affirmative misrepresentations on which

22   a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the

23   plaintiff's economic loss."  *Id.* at 993; *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*,

24   660 F. Supp. 2d 1163, 1183 (C.D. Cal. Oct. 5, 2009) (noting *Robinson*'s narrow and limited

25   holding).

26        Here, Nada does not allege that Besser made any affirmative misrepresentations on which it

27   relied, nor does it allege that it was exposed to liability for personal damages independent of the its

28   economic loss.  Without having done so, Nada cannot fit within *Robinson*'s narrow and limited

1   holding.

2       Accordingly, the court concludes that the economic loss rule applies and bars Nada's tort claims

3   against Besser.

4                                    **CONCLUSION**

5       Based on the foregoing, the court **GRANTS** Besser's motion for summary judgment.

6       **IT IS SO ORDERED.**

7   Dated: November 10, 2014                    _____

8                                               LAUREL BEELER
                                                United States Magistrate Judge
9

United States District Court
For the Northern District of California